Exhibit 1: Transcript of January 14, 2019 Press Conference

Grand Jury Press Conference
January 14, 2019

1

2   DEBRA HINKEL/ESTATE OF ROBERT RAMIREZ,

3   v.

4   DEREK COLLING,

5   _____/

6

7

8

9

10

11

12              GRAND JURY PRESS CONFERENCE

13                   01/14/2019

14

15

16

17

18

19

20

21

22

23

24

25

Grand Jury Press Conference
January 14, 2019                                    2

1          PEGGY TRENT:  I'm just going to go ahead and

2     get started.

3               First of all, thank you for attending

4     today.  I called a press conference today to provide

5     the public information on the grand jury proceedings

6     relating to the criminal investigation of Corporal

7     Derek Colling of the Albany County Sheriff's Office

8     for the shooting of Robby Ramirez on November 4th and

9     to discuss next steps.

10              First, I'm truly sorry for the death of

11     Robby Ramirez.  I was conducted immediately after the

12     shooting by the mother of Robby Ramirez, and it was

13     prior to actually being advised as the county

14     attorney that a shorting had occurred.  His mother

15     wanted to know from me why, how could this happen.

16              Those comments from the beginning have

17     carried with me through the entire investigation and

18     to the point that I stand before you today.  After

19     the shooting I was immediately questioned by law

20     enforcement whether I should remove myself from this

21     case due to me being called by Robby's mother due to

22     the fact I knew his mother in a capacity of a mental

23     health board.  At that point I even questioned well,

24     I know the officer too.  How is that any different.

25     I felt I had no legal conflict at this time.

 1              As a matter of fact, I had researched this

 2    issue after the first shooting that had occurred in

 3    2015 at the Snowy Range Ski Resort which involved

 4    Albany County sheriff officers at that time.  In that

 5    particular shooting, as I did at the subsequent

 6    shooting at Vedauwoo and this shooting, I immediately

 7    reached out to the Wyoming State Bar Counsel to

 8    discussion whether I had a legal conflict, and each

 9    time I discussed I followed the advice of what I was

10    told in discussing this matter with that legal

11    counsel.

12              In the first shooting that occurred in

13    Snowy Range in '15 the officers involved were the

14    judge's son who worked for the sheriff's office.  As

15    you can imagine, I practiced in front of that judge

16    on a regular basis, and I had a legal conflict and

17    requested to be removed from that case, and I did so,

18    and at that point I reached to the attorney general's

19    office in an effort for them to handle the review.

20              In the second shooting that happened since

21    I've taken office, that occurred at Vedauwoo.  Again

22    an Albany County sheriff's deputy was involved in

23    that shooting, and I did not, as I reached out to bar

24    counsel, recuse myself of having a legal conflict,

25    but made that decision.  But up to this point I

Grand Jury Press Conference
January 14, 2019                                    4

1  question our system in the state of Wyoming and how
2  we investigate officer involved shooting with deadly
3  force.  At that point I reached out to my colleagues
4  throughout the state of Wyoming, and I reached to
5  them to see what their thoughts were, and how could a
6  county and prosecuting attorney who represents the
7  Albany County Sheriff's Office in a civil capacity
8  also investigate a sheriff deputy.  In addition, I
9  reached out to various attorneys as to conflict.  I
10 researched American Bar Association.  I looked into
11 this matter thoroughly to kind of understand when
12 there was a next shooting how would I hand it and
13 what I would do differently.

14        What's most noteworthy in the state of
15 Wyoming, there's no state statute on deadly force.
16 There's know protocol, there's no process.  It's
17 basically the way it's always been done in the state
18 of Wyoming, is that the DCI, which is the Division of
19 Criminal Investigation, would investigate the matter
20 and then they refer it to the county and prosecuting
21 attorney or DA in that community to determine if it's
22 justified.

23        In reviewing that process, I felt we could
24 do it better, and I had back then decided that I
25 would consider a grand jury.  But when I started

1  discussing a grand jury, you can't do that.  That's

2  not the way we do it in Wyoming.  It is up to you to

3  do it.  I was told I need to go get a special

4  prosecutor because I have a conflict.

5          I'm going to tell you, you want me in this

6  position doing it, and why is that?  Because I'm

7  accountable to the voters in that community.  A

8  special prosecutor that would come in is not

9  accountable to the community.  As a matter of fact, I

10  can tell you on the times that I have appointed a

11  special prosecutor I wish I would have personally

12  handled it because it would have been handled

13  differently in the way our community would expect me

14  to handle it as being elected as your county

15  attorney.

16          But in this case I elected to stay on it

17  for many reasons, and the reason that stood out in my

18  mind was back to how could this happen in our

19  community.  I felt by a thorough investigation, and I

20  assure you law enforcement did not agree with every

21  move I made, but I stood true no matter what the

22  public said, no matter what law enforcement said, I

23  knew this needed to be investigated properly and

24  thoroughly so we determined how could this happen in

25  our community.

 1           I sat down and I looked to other

 2  jurisdictions, and first thing what I find amazing is

 3  no one even knew what a grand jury really was in

 4  Wyoming.  The last grand jury, and from evidence I

 5  received was 1992 or 3 for a gas fixing case and had

 6  nothing to do with the criminal and type of these

 7  charge.

 8           At that point I decided the grand jury

 9  would have been effective, not because I feel that in

10  other states it's ineffective.  I felt in the state

11  of Wyoming it would be the best course of action.  It

12  would require each and every one of us looking at the

13  evidence, examining the evidence, asking those

14  questions that I've read in the social media, asking

15  people to be accountable, and I ask those questions

16  and I investigated.  Not only that, I secured two

17  experts to come into our community in order to

18  provide insight as to national standards and how it

19  should be done in the use of deadly force.  Those two

20  experts, and I had contacted another expert, but they

21  were not available over the holidays to testify,

22  actually came in following a model that I've seen in

23  Wisconsin.

24           This grand jury process differs from other

25  states in that this is not a grand jury that sits for

1  every case that's handled in our community.  Instead,

2  this grand jury is convened only for one matter and

3  one matter at all, and that was the shooting and

4  whether it was justified and whether criminal charges

5  should be filed against Corporal Derrick Colling.

6            At that point, what most people don't know

7  is this jury gets to ask questions.  They ask

8  questions of every witness.  They ask questions of

9  me.  A lot of the questions were what I had already

10  known from social media, and those questions were

11  asked in detail in putting those witnesses on the

12  spot to know why, how did this happen.  There was a

13  thorough investigation, and no disrespect to defense

14  attorneys, it was more raw, more direct towards those

15  witnesses than you would ever have in a courtroom

16  with a jury present with a judge.  Yes, the judge was

17  not present, but let me tell you, I asked the judge

18  about specific rulings of what was relevant, and two

19  things that I discussed with the judge that were not

20  presented were the prior shootings of Derrick

21  Colling.  Why is that not relevant?  It was because I

22  would need to present the facts on each of those

23  shootings in this case which takes away from the

24  relevancy of the facts of this case.

25            Furthermore, I did not present the facts

Grand Jury Press Conference
January 14, 2019                                    8

 1  concerning the victim in this matter, Robby Ramirez,
 2  and all of his law enforcement contacts and assaults
 3  that had occurred back in '04 and '05 resulting in
 4  the assault on two officers and the assault of a
 5  family member.  I felt again that required facts
 6  being introduced and reentered into this case which
 7  did not have any bearing.
 8             the grand jury asked questions.  Those
 9  questions were asked, but they were told as to the
10  relevancy and how we were focused on this.  This is a
11  criminal process, a criminal crime.  He was charged
12  and asked to be reviewed whether he committed the
13  offense of involuntary manslaughter.  It is a
14  specific definition under the state statute of what
15  must be proven of the elements, and one of the key
16  elements, was it justified.
17        Now, it may not be the result that some
18  people wanted, but I will submit to you that the
19  system did not fail.  The jury system is there for a
20  reason, and this system was done fairly and the
21  evidence was presented.  No one is happy.  Law
22  enforcement is not happy that I now have said in
23  Albany county we will put deadly force to a grand
24  jury.  The citizens aren't happy because in their
25  mind he should be criminally prosecuted for the acts

 1  he did on this.  I am here to tell you that the

 2  evidence did not meet that the level of probable

 3  cause, and at this point the next steps are where do

 4  we go.

 5           Well, I'll tell you, it goes back to that

 6  question that was asked of me, how could this happen.

 7  How could this happen and why did it happen, and so

 8  that takes the point of an elected official and all

 9  of us to now start looking at where do we go from

10  here.  With every case I take to a grand jury and,

11  every Wednesday I hold case reviews where we look at

12  facts.  We look at the officers and how they acted.

13  We look at what could we do differently in our

14  investigation, and that's exactly what I intend to do

15  with this case.  I believe that DCI and how this was

16  investigated and how this matter was handled needs to

17  be reviewed, and I intend to do that with one of our

18  experts to facilitate that dialogue as we

19  self-reflect on how can we do better and how we

20  handled this process.

21           This process and what we had here should

22  not be what happened today.  We shouldn't have had to

23  have citizen groups formed.  We should have policies

24  and procedures in place.  How do we handle when the

25  unfortunate use of deadly force is used.  We have

1  none  We have no policies.  No one has policies of
2  the prosecutors, so we need to do a better job on how
3  that's handled.  We need to do a better job on how we
4  communicate what was going on.
5           Grand jury proceedings are secret.  They're
6  secret for a reason in order that the attempt is to
7  get the information to the grand jury.  At this point
8  I think the process needs to be looked at, maybe on a
9  state level.  How do we handle deadly force as a
10  state.  How do we handle it with training.
11          Some of the things we're currently doing is
12  with the Albany County Mental Health Board in looking
13  at CIT training for more intervention.  But I'll
14  submit to you even with this process we never looked
15  it from a traffic stop perspective.  How do you know
16  when someone's mentally ill in a traffic stop?  We've
17  never approached that.  I'm not sure if that's been
18  approached nationally, but it needs to be approached
19  as well.
20          As we move forward, the next step now is
21  personnel, and that will be handled by Sheriff
22  O'Malley.  Sheriff O'Malley has an attorney that will
23  be retained in order to help him.  What you don't
24  know is I removed myself from the personnel matter
25  exactly the first week and asked the county

1  commissioners for him to retain counsel.  I removed

2  myself from the civil piece of this and kept myself

3  on the criminal portion of this investigation.  In

4  addition, I received correspondence early on in that

5  first week about the potential of litigation.

6          Underlying all this has been several areas

7  of where this particular matter could go, and rightly

8  so.  We all should be accountable for what happened,

9  and so with that we have a civil attorney.  So the

10  civil attorney is also representing my role with

11  solely the criminal and how it would go forward.

12          At this point again the question needs to

13  be answered how can this happen.  I know that there

14  was a citizen group.  I attempted to attend that.  I

15  was called by ACL specifically and told not to

16  attend.  This is not the way, and I was told.  As

17  elected official people did not feel safe to open up

18  and to talk.

19          We need to have these difficult

20  conversations, and they may not be difficult for

21  people to hear, but we need to hear that.  And part

22  of having a case review, we also need a facilitator

23  that's unbiased to come in and facilitate that

24  dialogue as to how we can make the changes so this

25  doesn't happen again.  But at this point I felt it

1  was necessary to have this press conference because I

2  believe facts were not getting out.  And quite

3  frankly, the way the process was, we didn't have a

4  process to follow to know how to handle it, and now

5  we will change the way that occurs.

6          So at this point I wanted to let you know

7  these are the next steps that we intend to do, and if

8  there's any questions I'd be glad to answer them.

9          SPEAKER:  Peggy, in the last police-involved

10 shooting, at least that I was familiar with, was the

11 Vedauwoo one in that case.  You made the determination

12 whether there was probable cause and then released

13 information about why there wasn't and a lot of details

14 with the facts of the case.  You mentioned about why a

15 grand jury was appropriate to let citizens decide, but

16 why was that a better process than putting out in public

17 an explanation of there wasn't -- if there wasn't, and

18 you determined, here's why there wasn't problem cause

19 and here's an explanation.

20         PEGGY TRENT:  Good question.  As a matter of

21 fact at that the time, and I'll be candid, I was being

22 told this was the way it had to be done.  I was told

23 that it is the sole decision of the DA or the county

24 attorney.  I was inquiring of my counterparts in all 23

25 counties.  I'm the president of the association, even

1  inquiring is this the proper way to do it, and at that

2  time I had elected because that would have been my first

3  one to be actually without a conflict of interest to

4  handle.  So at that point I elected to go forward with

5  it and make that sole decision.  It didn't feel right.

6  I felt it needed to be responded to from the public.

7          Also, I think the process of going through

8  grand jury forces officers, forces me, forces

9  everyone to do a better job examining what protocols

10 or processes be reevaluated.  That didn't occur after

11 that shooting, so that's why I feel the grand jury

12 forced the issue for us to look inward, and not just

13 because it was an individual who had previously been

14 in other shootings.  It was this shooting.  These

15 facts needed to be examined in a light of community

16 people.

17          And I do want to add onto that, the jury

18 selection in this is unique too.  Jury selection for

19 a grand jury is for cause.  So if I believe you're

20 supposed to not have preconceived ideas, well the

21 pretrial publicity was out there that everybody had

22 heard or read something about this.  So there were

23 people on the jury that we attempted I know to try to

24 get past any preconceived ideas.  They could not be

25 dismissed for anything but cause, meaning they

1  couldn't serve for one reason or another.

2          There were 12 jurors selected, and even

3  with the jury instruction, there were questions asked

4  about evidence that we did not present, these two

5  pieces of information that I previously discussed,

6  but it was important that they set aside that and

7  listen to the facts that were presented.

8          SPEAKER:  Peggy, (phonetic).  Can you please

9  tell me when the grand jury met, over what dates and the

10  breakdown male/female.

11          PEGGY TRENT:  I can't talk about the jury

12  itself.  I'm prohibited by state statute and ethically,

13  but I can tell you they were convened early, I think

14  mid -- I started filing the documents I believe, I don't

15  want to -- November.  But I knew immediately on

16  November 8th that I was going to convene a grand jury.

17  It was January 8th is the date we selected to start the

18  grand jury and select the grand jury.  Jurors were

19  called to the room.  They thought they were appearing

20  for a criminal matter.  It was held over at UW College

21  of Law because we had another jury trial going on here,

22  and also the deliberation room here we did not have the

23  ability for the equipment and how that would look like

24  in a grand jury setting here, so we used the law school.

25          They convened, so the jury was selected on

1  January 8th.  Evidence started to commence on the 8th

2  and continued on to the 9th and 10th, and then they

3  deliberated on the 10th and reached their decision.

4             SPEAKER:  Were they sequestered in any way

5  over that time?

6             PEGGY TRENT:  No.  And I can tell you from

7  their questions they were asking items that were from

8  social media.  I had been reading all social media, so I

9  tried to address their questions.  Their questions were

10 outstanding.  They asked the hard questions that I take

11 back with me of how can this happen and how can we fix

12 it.

13            SPEAKER:  What I heard you say is given we

14 have the jury didn't find a need to indict Colling, but

15 then you also talk about how we need a change?

16            PEGGY TRENT:  Yes.

17            SPEAKER:  So can you talk more specifically

18 about the policies and statutes at the state and the

19 county level that you think need to be addressed?

20            PEGGY TRENT:  Yes.  So from an officer

21 shooting, it's unlike if a citizen used self-defense.

22 This is justification, and the jury in instructions and

23 out all of the law does not lean itself to this type of

24 procedure for grand jury, so we use case law of Supreme

25 Court, Wyoming Supreme Court for justification.  So

1   where it provides the issue is this is not the norm.  I

2   think it should be the norm that we convene a grand jury

3   when there's an officer-involved shooting.  I believe

4   that there needs to be some higher standard for officers

5   as well as prosecutors when deadly force is used.  And

6   so that's what I'm referring is that we need to have

7   some time of reform statewide to direct, or we will

8   have, as you've heard in the past few weeks, all the

9   officer-involved shootings.  It's being decided by a

10  county or prosecuting attorney or DA.  And I believe in

11  my opinion we need more accountability and oversight,

12  and that proceeds it by going to a grand jury which is

13  comprised of citizens.

14          SPEAKER:  It still feels like the conversation

15  is limited to a justification of use of force, and I'm

16  wondering if there's a policy conversation about

17  alternatives --

18          PEGGY TRENT:  Yes.

19          SPEAKER:  -- to facilitate a conversation

20  about things like deescalation as opposed to being

21  limited to was this death justified or not.

22          PEGGY TRENT:  Well, first of all, I was

23  deciding the criminal component.  So now you come back

24  to mother's question, how could this happen, and that's

25  where the question because of the investigation, because

1  of the thoroughness of grand jury, it allows us now to

2  ask those questions how could this happen, what could we

3  do differently, how could we look at traffic stops, how

4  do we identify, if we can, whether someone's acting out

5  of anger, ready to attack, or mentally ill.  How do you

6  handle it, can you deescalate it.  So these are

7  conversations that came out of it as a result of the

8  criminal process.  It's not saying the criminal, the

9  deescalation necessary is in the elements of the crime.

10 It's what do we do now for policy.

11         SPEAKER:  Now, do we know what's next for

12 Colling?  Can the public expect him back on the streets?

13         PEGGY TRENT:  You will have to direct that to

14 Sheriff O'Malley.  That is a personnel matter.  As a

15 matter of fact, I'm the criminal.  As I indicated, there

16 will be an attorney that will be representing Sheriff

17 O'Malley and at this point they will deal with that

18 separately.

19         SPEAKER:  And would that also be where to

20 direct a question about possible protocol breach during

21 that traffic stop, and you just had talked about a

22 deescalation.  Kind of what led to just sheer aggression

23 right off the bat?

24         PEGGY TRENT:  That's where that conversation

25 will occur during a personnel matter, did he adhere to

1  all of the policies and, you know, reflecting on

2  training and so forth like that.

3          SPEAKER:  He does remain on administrative

4  leave pending the sheriff's determination?

5          PEGGY TRENT:  As far as I know he's on

6  administrative leave as of today, so he's still on

7  administrative leave.

8          Mr. Hale?

9          MR. HALE:  Yeah, several questions.  I assume

10  there will be some preservation of evidence so we won't

11  have a repeat of the shredding incident with the resume

12  that the city had.  That's one question.

13          PEGGY TRENT:  I'm not familiar with that.

14          MR. HALE:  Yeah, the resume of the director at

15  the rec center.

16          PEGGY TRENT:  Oh, okay.

17          MR. HALE:  Secondly, am I to understand that

18  the grand jury couldn't listen to the evidence and ask

19  questions if the public was there?  I fail to see the

20  connection or the justification by not having the public

21  there.  And then third, do you agree with that process

22  that the public should not be involved?

23          PEGGY TRENT:  Okay.  First of all, your first

24  question as to the matter over at the city and shredding

25  of evidence, just to let you know we have preserved all

1    of the evidence.  As a matter of fact, we received a

2    letter early on where it preserved everything and

3    nothing will be, how shall I say destroyed.  It will all

4    be preserved for the case.

5            The second issue you raised is the grand

6    jury and how the public is precluded from that

7    process and it's done in secrecy.  That's currently

8    the state law and that's kind of the process -- it

9    is, not kind of, the process throughout the United

10   States for grand jury.

11           I want to clarify the difference between a

12   federal grand jury and state.  Federal is convened

13   regularly.  State is not here in Wyoming, but that

14   is -- it is secret, and it is to the point where

15   public is precluded, and no one is permitted in the

16   room, but the grand jurors and myself and the court

17   reporter, and that's it.  And we -- and they ask

18   questions back and forth of what they want as I

19   present the evidence, so they're holding me

20   accountable to what I'm presenting.

21           And your last question was do I feel the

22   public should be involved.  I believe the public --

23   this is a crime has occurred.  Let me give you the

24   difference of a grand jury.

25           Normally in Wyoming we don't convene grand

1    jury.  I worked under that system as a prosecutor in

2    Ohio where we convened a grand jury.  As a matter of

3    fact, I did a stint in the grand jury division, and

4    basically you would present all of your felony cases

5    to the grand jury.  To me you get to know your grand

6    jury, and it's more what people feel that it's not a

7    good process because it's kind of everybody knows

8    everybody and they just kind of go through and rubber

9    stamp it.

10           This process is unique because it's

11   convened specifically for this, and it was done more

12   or less on this case and there's no relationship

13   really.  You're just -- they don't know me, I don't

14   know them and they're just asking the questions.

15           As to the public being involved, this is as

16   criminal -- we normally -- I charge felonies in my

17   office.  I have officers what's called affidavit of

18   PCs attesting to the facts that result in that, and

19   then it can go to the preliminary hearing to

20   determine there's probable cause.  There in the

21   preliminary hearing the public is involved.  But in

22   this case it was more into justification in

23   determining was it justified or unjustified.  I had

24   not -- I have to admit, it wasn't until after the

25   close of the case that I could say my mind was even

1    made up, and I think that the grand jury did a great

2    job in listening to the evidence and asking the hard

3    hitting questions that they did throughout the case,

4    so I think I answered your question.

5              MR. HALE:  I think the problem the public has,

6    I know I certainly did, and that is when we have elected

7    officials such as yourself talking about accountability,

8    transparency, and then when it comes to walking the talk

9    it's going to be secret.  The two seem to be

10   conflicting.

11             PEGGY TRENT:  The other process was for me to

12   make the sole decision, and I think that's even worse.

13   So in our system in the world right now there's two

14   ways.  Either the prosecutor makes it sole decision, one

15   person who's an elected official, or we go with 12

16   people to ask questions and who make those decisions.

17   And you can convene your grand jury for other matters

18   too, but we elect not to and have not.

19             Now that I know the process and we've now

20   created it, I may use it more often in certain cases,

21   and I could tell you those would be reserved, I know,

22   for officer-involved shootings right now.  But I do

23   believe that that is a better process than one person

24   making the decision.

25             SPEAKER:  Two questions.  One is what efforts

1   did you make in screening expert witnesses to make sure

2   that they weren't unfairly biased towards law

3   enforcement, and why was there not an expert witness who

4   was specific to mental health or police shooting like

5   victims advocate, something along those lines?

6           PEGGY TRENT:  Good question.  There were

7   several experts that were provided to me, and actually

8   three.

9           SPEAKER:  Who provided them to you?

10          PEGGY TRENT:  Another law enforcement agency,

11  DCI and others provided me names.  I also did a Google

12  search to see what was out there in experts in this area

13  in trainings I've gone to personally and I've seen.  So

14  from those experts, we were able to dwindle it down to

15  two experts, and what was really of concern to me was

16  not only the use of force and whether, you know, the

17  policies and national standards, but also someone to

18  come in and review those items.

19          Also, I had questions about the taser in

20  this case and the video camera, body camera, and

21  they're by taser, the same company.  I really wanted

22  to be able to answer how did that video camera turn

23  off, how come the taser didn't work, was it activated

24  properly.  I wanted that investigated thoroughly so

25  that I understood what was happening, wanted to know

1  is it common practice to pull a taser and a firearm

2  at the same time.  I wanted to know those questions

3  as we were going through the policies and national

4  standards because we wouldn't know those national

5  standards.

6         Standards and policy are driven by case

7  law.  Case law then the sheriff's office or the law

8  enforcement can even add stricter standards.  But

9  getting back to mental health, those records and

10  everything, even though it wasn't provided to the

11  grand jury, all of that was provided to the expert so

12  that they had the mental health records and all of

13  it.

14         What they were focused on and I think what

15  people don't understand was the traffic stop.  there

16  was evidence, and I wanted to know how we didn't

17  know, just like the mother asked, how did he not know

18  him.  That was a question that kept coming out.  How

19  do you not know him if you went to high school with

20  him.  How did you not know him that day.

21         We were very focused on looking at that

22  video to kind of determine did he know him, was there

23  signs of that, so the expert was focused on this, but

24  this was a traffic stop, not what we normally get,

25  and I deal with our involuntary commitments in our

1  office personally, not the typical where we're called

2  out, officers are called out to a scene to intervene

3  with a mental health crisis or anything that's

4  happened.  this was a traffic stop, so we were

5  looking at it from that perspective.

6         As I said, where do we go from here, how

7  could this happen.  These are things that I think

8  need to be looked at for training.  But yes, those

9  were all given to this expert, everything.

10         SPEAKER:  Yeah.  I guess I understand that

11  there was technical information that you were asking him

12  to evaluate.  What I'm talking about is bias, though.

13         PEGGY TRENT:  Oh, yeah.  I even asked the

14  officer how do you -- you seem pro law enforcement, so

15  are you going to move, and the answer is no.  He gave

16  the good, bad and everything in between to the grand

17  jury of what he observed.  You have to remember, this is

18  a criminal charge of involuntary manslaughter.

19         The policy issues is a different issue,

20  different area.  But he was -- you have to understand

21  policy of law enforcement.  You have to be a law

22  enforcement officer to understand it too.  You

23  couldn't come in and evaluate a police just from

24  that.  You're looking at the outcome vs. process, how

25  does a police officer respond.  There's a different

1    lens that you're looking at it.

2            SPEAKER:  So speaking of the body cam footage,

3    is that going to be released to the public?

4            PEGGY TRENT:  Yes.  I have been advised by the

5    civil attorneys I am not to release it and against their

6    advice.  I'm releasing it.  I believe it should be

7    released.  I believe in the public records.  I said I

8    would and I will.  We brought copies.

9            The problem is the dash come is left on for

10   several hours and takes a long time to download, but

11   I can release it all you want.  You can look at the

12   body footage.  I can tell you right now the footage

13   is no different than what you have on You Tube.

14           I think people in the community want --

15   they think the answers are there.  There's more to

16   this.  It's subjective too, what was going on in the

17   officer, what was going on in the mind what happened

18   afterwards, what evidence was collected.  It's more

19   than just that video that is out there.  But sure,

20   you can have it, but it's against legal advice.  I'm

21   probably going to get in trouble, but I decided that

22   I believe the body cam and the dark cam and the radio

23   traffic should all but released, so I will be

24   releasing those.  The problem is, again, getting it

25   downloaded and being aware of that.

1        SPEAKER:  And where was that shift from

2   originally when we had come to that first conference to

3   the now wanting to release it?

4        PEGGY TRENT:  The criminal investigation is

5   complete.  Grand jury has made a decision.  I have

6   nothing further to deal with the criminal aspect.  Now

7   it's moving to the civil arena, which is personnel and

8   civil liability.  So to me, just like any felony or

9   criminal case, I would release what is necessary, and in

10  the statute says I may release it, and I believe I no

11  longer have a reason.

12       I knew early on when we had done the press

13  conference I was moving in that direction and I knew

14  I was going to and could not release it because we

15  were analyzing that footage.

16       SPEAKER:  Now, is any of the evidence the

17  grand jury going to be --

18       PEGGY TRENT:  No.  All of that is sealed right

19  now.  That will be up to the civil attorneys eventually.

20  I do anticipate filing a motion to unseal it, but at

21  this point I'm not doing that.  The civil is kicking in

22  now, and then all of that will go forward.

23       SPEAKER:  Peggy, this is kind of a convoluted

24  question with that subjective element that you discuss

25  and you mentioned that you consulted with Judge Kricken

1    about the relevance of the previous shootings that Derek

2    Colling was involved in and it kind of gets to that like

3    just the general 404B concept of --

4              PEGGY TRENT:  Other acts?

5              SPEAKER:  -- of establishing a pattern of

6    conduct, and I was wondering if do the same principles

7    on 404B exceptions apply to a grand jury as they do to a

8    jury trial and if so, does the pattern of conduct have

9    any relevance to an officer's justification, and if so,

10   why is that not relevant?

11             PEGGY TRENT:  That's a great question.  The

12   case law doesn't dictate that that would be admissible

13   and rules of evidence do not apply, which meant there

14   was hearsay.  That's why the jurors could ask the

15   questions even though it wasn't following adhering to

16   the rules of evidence a lot of their questions.  But

17   essentially other acts, you would have to show those

18   shootings were similar and situated if we were to do it

19   for other acts and you don't have those here.  Those

20   were each individually different circumstances than

21   this.

22             On the flip side, should we have entered

23   the victim and their acts of assaulting an officer

24   and/or family member as being violent, and I felt

25   that that was inappropriate because you have to look

1   at this facts because those facts were different.  So

2   there was that looking at both to see can you admit

3   it or not.

4            We did talk about his mental health

5   condition on that day.  We did talk about his -- I

6   can't get into it, but we talked about different

7   things along that line.

8            SPEAKER:  And aside from Judge Kricken, did

9   you consult with the AG or bar counsel about what

10  evidence to introduce and how to introduce it, that sort

11  of thing?

12           PEGGY TRENT:  Bar counsel, no.  I only talked

13  about legal conflict.  AG's office, yes.  I did speak

14  with them about evidence, not detailed as you think.

15  More just jury instructions and what the law and how to

16  advise the grand jury.  We had never convened one.  As a

17  matter of fact, one has never been convened in the state

18  of Wyoming, so it was working together to figure that

19  out.

20           I did consult with other county and

21  prosecuting attorneys and DAs throughout the state.

22  They also factored in in talking to me as well.

23           SPEAKER:  Now, what's next for your office and

24  law enforcement?  It's clear that there's a strain

25  between you guys and the community now.  How are you

1  moving forward?

2          PEGGY TRENT:  One step at a time.  I have a

3  job to do.  I was elected to do my job regardless of

4  this case.  I did the right thing in my mind for making

5  this accountable.  I just keep moving forward to take

6  each case, and we had a full weekend and you just keep

7  moving forward.

8          As to moving forward as a team, I believe

9  in a case review.  A case review will actually

10 examine the process and how we can do it better and a

11 facilitator talking to myself and the sheriff's

12 office and DCI in how we can do this better.

13         SPEAKER:  In terms of the process of changing

14 policy moving forward, what would you say to people who

15 said there was no indictment so we don't have a problem?

16 I mean, I think people see impunity as an indicator that

17 nothing is going wrong and potentially see charges as a

18 sign that there is a problem, so how do you explain that

19 to maybe Collinghg's co-workers or people in the

20 community who are like oh, cool, it's over and done and

21 that kind of thing?

22         PEGGY TRENT:  Well, first of all, you have to

23 know what I brought to this office in case reviews.  And

24 if I had the media here for every sexual assault trial

25 we go and there's a not guilty, let me tell you the

1  debriefing is heavy when there's a not guilty to figure

2  out how can we do it better, how can we present the

3  evidence.  It's the same thing in this case.

4           I view this as serious, how could we do it

5  differently, what we could do.  But a lot of this

6  requires Sheriff O'Malley, and it's on his shoulders

7  of how he takes this and proceeds with his deputies,

8  and I think he is at this point looking at bringing

9  in that expert to examine the policies and determine

10  what we can do better, kind of listening to what

11  other actions that could be implemented in the

12  future, and I guess that's upon us elected officials

13  to make that happen, another reason why I wanted to

14  stay in this to make it happen and to follow it

15  through.  And if you don't know me, I basically, when

16  I say I'm going to do something, I did it and I did

17  it with juveniles and I'm going to continue with

18  mentally ill and how we handle it.

19           SPEAKER:  Can you tell us the vote count on

20  whether to indict.

21           PEGGY TRENT:  As I said earlier, I'm unable to

22  do that.  The rules specifically prohibit me from

23  telling you the vote count.  I want to tell you so badly

24  you don't even know because I think it would answer a

25  lot of your questions, but at this point I can't and I'm

1  prohibited.  I even had to call bar counsel and ask bar

2  counsel if I could please tell you.  I spoke to the U.S.

3  Attorney's Office because they deal in federal grand

4  juries.  I am prohibited by law.  And even if I told

5  you, then you would know the vote, so I can't even tell

6  you.

7          SPEAKER:  Can you expand just a little bit on

8  what are some of the actions that could be taken after

9  you review this case?  You've talked a lot about the

10 questions that are going to be asked, but are there

11 actual changes that can be made, or is it mostly you

12 guys would make suggestions to maybe the sheriff's

13 office about policy changes or things that you think

14 need to happen?

15         PEGGY TRENT:  Right.  Well, some of the

16 changes is we need a protocol and a process.  We have to

17 figure out for the next shooting because it could happen

18 today how are we going to handle it, how am I going to

19 do it differently.  I've learned a lot.  Some of you

20 from the media will laugh because I was told by someone

21 back there that we should have a press person and we

22 should know how to do this and I don't.

23         I wasn't prepared, and I'll be candid with

24 you, we hadn't had this in our office or the staffing

25 levels to do that.  I've learned a lot, you know,

1  from this, and I think immediately there will needs

2  to be a process and protocol how the media, how the

3  public is informed.  I believe that there does need

4  to be transparency and openness.  I thought I was

5  doing the right thing.  I actually called Casper,

6  which is where I heard -- I am not following the way

7  Casper Police Department did it, but I actually

8  called Casper and handled it that way by doing a

9  press conference.  I felt I could not because of the

10  grand jury.  I knew I was going to release the

11  evidence, but I thought I could at least show it and

12  address it immediately.  So I think lessons learned,

13  you know.

14          I was told afterwards, and unfortunately

15  everyone told me you should never have even done the

16  press conference, and I disagree.  I felt I needed to

17  do that to get it out.  I guess the mistake is I

18  didn't put it on social media.  I didn't know how I

19  should have done it.

20          Another lesson learning is we need to

21  immediately get mental health training of officers

22  implemented immediately.  Right now the -- we are

23  working and moving in that direction, but we need to

24  move quickly.  We haven't had that training in

25  numerous years and it has to happen just in general,

Grand Jury Press Conference
January 14, 2019                              33

```
 1  not just in -- and then kind of carrying it over to
 2  traffic stops.  I do have the ability to help with
 3  that.  But the other material reviewing the actual
 4  policies, that's going to have to come from Sheriff
 5  O'Malley's office.
 6          SPEAKER:  So just to be clear, you guys can
 7  review that and kind of push for more training, push for
 8  those things.  But as far as actually having the
 9  authority to make those changes, that comes from the
10  sheriff's office?
11          PEGGY TRENT:  Correct.
12          SPEAKER:  Thank you.
13          PEGGY TRENT:  Okay.  If there's not any other
14  questions?
15          SPEAKER:  Peggy, so a number of us understand
16  the grand jury findings are actually recommendations and
17  are not binding and they're ultimately still your choice
18  whether charges are pressed.  Is that true in this case
19  or not?
20          PEGGY TRENT:  No, it's not.  In Wyoming they
21  made the decision of no bill.  I am bound by that.  I
22  felt their decision spoke loudly to me in how to
23  proceed.
24          I did reach out to the U.S. Attorney's
25  Office to inquire about a 1983 action and/or criminal
```

1  action, civil action doing that.  At this point
2  you'll find that amusing because the government shut
3  down their nonessential personnel at the Department
4  of Justice right now.  But I did speak with a
5  representative in the U.S. Attorney's Office.  If
6  that's something that does happen which, you know,
7  with the disclosure of evidence that's another reason
8  why we're kind of dragging releasing anything in the
9  motion for the sealing of the grand jury, they would
10  needed that evidence preserved.  But I am not, due to
11  the grand jury's findings and what was communicated,
12  I will not be requesting that, but if the family goes
13  and requests it, that's fine.  And then they will
14  conduct their own investigation by FBI.  And I
15  thought that's what ACLU had communicated to me at
16  some point in some conversation that they were going
17  to do that from DOJ.  I maybe incorrect.
18         SPEAKER:  Sorry, if I can ask a question.  You
19  were talking about the experts who testified that they
20  knew about Robby's mental health issues.
21         PEGGY TRENT:  Uh-huh.
22         SPEAKER:  And you said the mental health
23  issues were off the table along with the prior
24  shootings.  Was the expert aware of the prior shootings
25  or just the mental health issues?

1          PEGGY TRENT:  All of it.

2          SPEAKER:  All of it.

3          PEGGY TRENT:  They received personnel records,

4   everything.  They received everything in its entirety.

5   And I won't say mental health was not off the table, I

6   want to clarify.  Mental health was presented to the

7   jurors so that they knew because you needed to take in

8   his condition at the day.  That was relevant to know,

9   you know, that he was mentally ill.

10          I think through some of the testimony we

11  learned a lot about Robby and why he may have done

12  what he did, but we don't know, you know, at this

13  point, you know.  It goes back to the traffic stop

14  and looking at how we handled that.

15          Okay.  Is that it?  Okay.  Thank you very

16  much for coming.  I appreciate it.

17          (End of recording.)

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3         I, Charlotte Crandall, certify that I was

4    authorized to and did transcribe the foregoing audio

5    recorded proceedings and that the transcript is a

6    true and complete record of my stenographic notes

7    from an audio recording and was transcribed to the

8    best of my ability.

9

10        Dated this 12th day of February, 2021.

11

12

13

14

15

16    _____

17    Charlotte Crandall
      Registered Professional Reporter

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**1**

**12**   21:15
**1983**   33:25

**4**

**404B**   27:3,7

**A**

**ability**   33:2
**accountability**
  21:7
**accountable**
  19:20 29:5
**ACLU**   34:15
**action**   33:25
  34:1
**actions**   30:11
  31:8
**activated**
  22:23
**acts**   27:4,17,
  19,23
**actual**   31:11
  33:3
**add**   23:8
**address**   32:12
**adhering**
  27:15
**administrative**
  18:3,6,7
**admissible**
  27:12
**admit**   20:24
  28:2
**advice**   25:6,
  20
**advise**   28:16
**advised**   25:4
**advocate**   22:5
**affidavit**
  20:17

**AG**   28:9
**AG's**   28:13
**agency**   22:10
**agree**   18:21
**amusing**   34:2
**analyzing**
  26:15
**and/or**   27:24
  33:25
**answers**   25:15
**anticipate**
  26:20
**apply**   27:7,13
**area**   22:12
  24:20
**arena**   26:7
**aspect**   26:6
**assault**   29:24
**assaulting**
  27:23
**assume**   18:9
**attesting**
  20:18
**Attorney's**
  31:3 33:24
  34:5
**attorneys**
  25:5 26:19
  28:21
**authority**
  33:9
**aware**   25:25
  34:24

**B**

**back**   19:18
  23:9 31:21
  35:13
**bad**   24:16
**badly**   30:23
**bar**   28:9,12
  31:1
**basically**
  20:4 30:15

**bias**   24:12
**biased**   22:2
**bill**   33:21
**binding**   33:17
**bit**   31:7
**body**   22:20
  25:2,12,22
**bound**   33:21
**bringing**   30:8
**brought**   25:8
  29:23

**C**

**call**   31:1
**called**   20:17
  24:1,2 32:5,8
**cam**   25:2,22
**camera**   22:20,
  22
**candid**   31:23
**carrying**   33:1
**case**   19:4
  20:12,22,25
  21:3 22:20
  23:6,7 26:9
  27:12 29:4,6,
  9,23 30:3
  31:9 33:18
**cases**   20:4
  21:20
**Casper**   32:5,
  7,8
**center**   18:15
**changing**
  29:13
**charge**   20:16
  24:18
**charges**   29:17
  33:18
**choice**   33:17
**circumstances**
  27:20
**city**   18:12,24
**civil**   25:5
  26:7,8,19,21

**34:1
clarify**   19:11
  35:6
**clear**   28:24
  33:6
**close**   20:25
**co-workers**
  29:19
**collected**
  25:18
**Colling**   27:2
**Collinghg's**
  29:19
**commitments**
  23:25
**common**   23:1
**communicated**
  34:11,15
**community**
  25:14 28:25
  29:20
**company**   22:21
**complete**   26:5
**concept**   27:3
**concern**   22:15
**condition**
  28:5 35:8
**conduct**   27:6,
  8 34:14
**conference**
  26:2,13 32:9,
  16
**conflict**
  28:13
**conflicting**
  21:10
**connection**
  18:20
**consult**   28:9,
  20
**consulted**
  26:25
**continue**
  30:17
**convene**   19:25
  21:17

convened
   19:12 20:2,11
   28:16,17
conversation
   34:16
convoluted
   26:23
cool  29:20
copies  25:8
Correct  33:11
counsel  28:9,
   12 31:1,2
count  30:19,
   23
county  28:20
court  19:16
created  21:20
crime  19:23
criminal
   20:16 24:18
   26:4,6,9
   33:25
crisis  24:3

---

**D**

dark  25:22
DAS  28:21
dash  25:9
day  23:20
   28:5 35:8
DCI  22:11
   29:12
deal  23:25
   26:6 31:3
debriefing
   30:1
decided  25:21
decision
   21:12,14,24
   26:5 33:21,22
decisions
   21:16
Department
   32:7 34:3
deputies  30:7

Derek  27:1
destroyed
   19:3
detailed
   28:14
determination
   18:4
determine
   20:20 23:22
   30:9
determining
   20:23
dictate  27:12
difference
   19:11,24
differently
   30:5 31:19
direction
   26:13 32:23
director
   18:14
disagree
   32:16
disclosure
   34:7
discuss  26:24
division  20:3
DOJ  34:17
download
   25:10
downloaded
   25:25
dragging  34:8
driven  23:6
due  34:10
dwindle  22:14

---

**E**

earlier  30:21
early  19:2
   26:12
efforts  21:25
elect  21:18
elected  21:6,
   15 29:3 30:12

element  26:24
end  35:17
enforcement
   22:3,10 23:8
   24:14,21,22
   28:24
entered  27:22
entirety  35:4
essentially
   27:17
establishing
   27:5
evaluate
   24:12,23
eventually
   26:19
evidence
   18:10,18,25
   19:1,19 21:2
   23:16 25:18
   26:16 27:13,
   16 28:10,14
   30:3 32:11
   34:7,10
examine  29:10
   30:9
exceptions
   27:7
expand  31:7
expert  22:1,3
   23:11,23 24:9
   30:9 34:24
experts  22:7,
   12,14,15
   34:19
explain  29:18

---

**F**

facilitator
   29:11
fact  19:1
   20:3 28:17
factored
   28:22
facts  20:18
   28:1

fail  18:19
familiar
   18:13
family  27:24
   34:12
FBI  34:14
federal  19:12
   31:3
feel  19:21
   20:6
felonies
   20:16
felony  20:4
   26:8
felt  27:24
   32:9,16 33:22
figure  28:18
   30:1 31:17
filing  26:20
find  34:2
findings
   33:16 34:11
fine  34:13
firearm  23:1
flip  27:22
focused
   23:14,21,23
follow  30:14
footage  25:2,
   12 26:15
force  22:16
forward  26:22
   29:1,5,7,8,14
full  29:6
future  30:12

---

**G**

gave  24:15
general  27:3
   32:25
give  19:23
good  20:7
   22:6 24:16
Google  22:11

government 34:2
grand 18:18
  19:5,10,12,
  16,24,25
  20:2,3,5
  21:1,17 23:11
  24:16 26:5,17
  27:7 28:16
  31:3 32:10
  33:16 34:9,11
great 21:1
  27:11
guess 24:10
  30:12 32:17
guilty 29:25
  30:1
guys 28:25
  31:12 33:6

**H**

Hale 18:8,9,
  14,17 21:5
handle 30:18
  31:18
handled 32:8
  35:14
happen 24:7
  30:13,14
  31:14,17
  32:25 34:6
happened 24:4
  25:17
happening
  22:25
hard 21:2
health 22:4
  23:9,12 24:3
  28:4 32:21
  34:20,22,25
  35:5,6
heard 32:6
hearing
  20:19,21
hearsay 27:14

heavy 30:1
high 23:19
hitting 21:3
holding 19:19
hours 25:10

**I**

ill 30:18
  35:9
immediately
  32:1,12,21,22
implemented
  30:11 32:22
impunity
  29:16
inappropriate
  27:25
incident
  18:11
incorrect
  34:17
indicator
  29:16
indict 30:20
indictment
  29:15
individually
  27:20
information
  24:11
informed 32:3
inquire 33:25
instructions
  28:15
intervene
  24:2
introduce
  28:10
investigated
  22:24
investigation
  26:4 34:14
involuntary
  23:25 24:18
involved

18:22 19:22
  20:15,21 27:2
issue 19:5
  24:19
issues 24:19
  34:20,23,25
items 22:18

**J**

job 21:2 29:3
Judge 26:25
  28:8
juries 31:4
jurors 19:16
  27:14 35:7
jury 18:18
  19:6,10,12,24
  20:1,2,3,5,6
  21:1,17 23:11
  24:17 26:5,17
  27:7,8 28:15,
  16 32:10
  33:16 34:9
jury's 34:11
Justice 34:4
justification
  18:20 20:22
  27:9
justified
  20:23
juveniles
  30:17

**K**

kicking 26:21
kind 19:8,9
  20:7,8 23:22
  26:23 27:2
  29:21 30:10
  33:1,7 34:8
knew 26:12,13
  32:10 34:20
  35:7
Kricken 26:25
  28:8

**L**

laugh 31:20
law 19:8
  22:2,10 23:7
  24:14,21
  27:12 28:15,
  24 31:4
learned
  31:19,25
  32:12 35:11
learning
  32:20
leave 18:4,6,
  7
left 25:9
legal 25:20
  28:13
lens 25:1
lesson 32:20
lessons 32:12
letter 19:2
levels 31:25
liability
  26:8
lines 22:5
listen 18:18
listening
  21:2 30:10
long 25:10
longer 26:11
looked 24:8
lot 27:16
  30:5,25 31:9,
  19,25 35:11
loudly 33:22

**M**

made 21:1
  26:5 31:11
  33:21
make 21:12,16
  22:1 30:13,14
  31:12 33:9

makes   21:14
making   21:24
  29:4
manslaughter
  24:18
material   33:3
matter   18:24
  19:1 20:2
  28:17
matters   21:17
meant   27:13
media   29:24
  31:20 32:2,18
member   27:24
mental   22:4
  23:9,12 24:3
  28:4 32:21
  34:20,22,25
  35:5,6
mentally
  30:18 35:9
mentioned
  26:25
mind   20:25
  25:17 29:4
mistake   32:17
mother   23:17
motion   26:20
  34:9
move   24:15
  32:24
moving   26:7,
  13 29:1,5,7,
  8,14 32:23

N

names   22:11
national
  22:17 23:3,4
needed   32:16
  34:10 35:7
nonessential
  34:3
number   33:15
numerous
  32:25

O

O'MALLEY   30:6
O'Malley's
  33:5
observed
  24:17
occurred
  19:23
office   20:17
  23:7 24:1
  28:13,23
  29:12,23
  31:3,13,24
  33:5,10,25
  34:5
officer
  24:14,22,25
  25:17 27:23
officer's
  27:9
officer-
involved
  21:22
officers
  20:17 24:2
  32:21
official
  21:15
officials
  21:7 30:12
Ohio   20:2
openness   32:4
originally
  26:2
outcome   24:24

P

pattern   27:5,
  8
PCS   20:18
Peggy   18:5,
  13,16,23
  21:11 22:6,10
  24:13 25:4

26:4,18,23
  27:4,11 28:12
  29:2,22 30:21
  31:15 33:11,
  13,15,20
  34:21 35:1,3
pending   18:4
people   20:6
  21:16 23:15
  25:14 29:14,
  16,19
permitted
  19:15
person   21:15,
  23 31:21
personally
  22:13 24:1
personnel
  26:7 34:3
  35:3
perspective
  24:5
point   19:14
  26:21 30:8,25
  34:1,16 35:13
police   22:4
  24:23,25 32:7
policies   18:1
  22:17 23:3
  30:9 33:4
policy   23:6
  24:19,21
  29:14 31:13
potentially
  29:17
practice   23:1
precluded
  19:6,15
preliminary
  20:19,21
prepared
  31:23
present   19:19
  20:4 30:2
presented
  35:6

presenting
  19:20
preservation
  18:10
preserved
  18:25 19:2,4
  34:10
press   26:12
  31:21 32:9,16
pressed   33:18
previous   27:1
principles
  27:6
prior   34:23,
  24
pro   24:14
probable
  20:20
problem   21:5
  25:9,24
  29:15,18
proceed   33:23
proceeds   30:7
process   18:21
  19:7,8,9
  20:7,10
  21:11,19,23
  24:24 29:10,
  13 31:16 32:2
prohibit
  30:22
prohibited
  31:1,4
properly
  22:24
prosecuting
  28:21
prosecutor
  20:1 21:14
protocol
  31:16 32:2
provided
  22:7,9,11
  23:10,11
public   18:19,
  20,22 19:6,
  15,22 20:15,

21 21:5 25:3,
7 32:3
**pull** 23:1
**push** 33:7
**put** 32:18

## Q

**question**
18:12,24
19:21 21:4
22:6 23:18
26:24 27:11
34:18
**questions**
18:9,19 19:18
20:14 21:3,
16,25 22:19
23:2 27:15,16
30:25 31:10
33:14
**quickly** 32:24

## R

**radio** 25:22
**raised** 19:5
**reach** 33:24
**reason** 26:11
30:13 34:7
**rec** 18:15
**received** 19:1
35:3,4
**recommendation**
**s** 33:16
**recording**
35:17
**records** 23:9,
12 25:7 35:3
**reflecting**
18:1
**regularly**
19:13
**relationship**
20:12
**release** 25:5,
11 26:3,9,10,

14 32:10
**released**
25:3,7,23
**releasing**
25:6,24 34:8
**relevance**
27:1,9
**relevant**
27:10 35:8
**remain** 18:3
**remember**
24:17
**repeat** 18:11
**reporter**
19:17
**representative**
34:5
**requesting**
34:12
**requests**
34:13
**requires** 30:6
**reserved**
21:21
**respond** 24:25
**result** 20:18
**resume** 18:11,
14
**review** 22:18
29:9 31:9
33:7
**reviewing**
33:3
**reviews** 29:23
**Robby** 35:11
**Robby's** 34:20
**room** 19:16
**rubber** 20:8
**rules** 27:13,
16 30:22

## S

**scene** 24:2
**school** 23:19

**screening**
22:1
**sealed** 26:18
**sealing** 34:9
**search** 22:12
**secrecy** 19:7
**secret** 19:14
21:9
**sexual** 29:24
**Sheriff** 30:6
33:4
**sheriff's**
18:4 23:7
29:11 31:12
33:10
**shift** 26:1
**shooting** 22:4
31:17
**shootings**
21:22 27:1,18
34:24
**shoulders**
30:6
**show** 27:17
32:11
**shredding**
18:11,24
**shut** 34:2
**side** 27:22
**sign** 29:18
**signs** 23:23
**similar** 27:18
**situated**
27:18
**social** 32:18
**sole** 21:12,14
**sort** 28:10
**speak** 28:13
34:4
**SPEAKER** 18:3
21:25 22:9
24:10 25:2
26:1,16,23
27:5 28:8,23
29:13 30:19
31:7 33:6,12,
15 34:18,22

35:2
**speaking** 25:2
**specific** 22:4
**specifically**
20:11 30:22
**spoke** 31:2
33:22
**staffing**
31:24
**stamp** 20:9
**standards**
22:17 23:4,5,
6,8
**state** 19:8,
12,13 28:17,
21
**States** 19:10
**statute** 26:10
**stay** 30:14
**step** 29:2
**stint** 20:3
**stop** 23:15,24
24:4 35:13
**stops** 33:2
**strain** 28:24
**stricter** 23:8
**subjective**
25:16 26:24
**suggestions**
31:12
**system** 20:1
21:13

## T

**table** 34:23
35:5
**takes** 25:10
30:7
**talk** 21:8
28:4,5
**talked** 28:6,
12 31:9
**talking** 21:7
24:12 28:22
29:11 34:19

taser  22:19,
  21,23 23:1
team  29:8
technical
  24:11
telling  30:23
terms  29:13
testified
  34:19
testimony
  35:10
thing  28:11
  29:4,21 30:3
  32:5
things  24:7
  28:7 31:13
  33:8
thought  32:4,
  11 34:15
time  23:2
  25:10 29:2
today  18:6
  31:18
told  31:4,20
  32:14,15
traffic
  23:15,24 24:4
  25:23 33:2
  35:13
training  18:2
  24:8 32:21,24
  33:7
trainings
  22:13
transparency
  21:8 32:4
TRENT  18:5,
  13,16,23
  21:11 22:6,10
  24:13 25:4
  26:4,18 27:4,
  11 28:12
  29:2,22 30:21
  31:15 33:11,
  13,20 34:21
  35:1,3
trial  27:8

29:24
trouble  25:21
true  33:18
Tube  25:13
turn  22:22
typical  24:1

_____

U

U.S.  31:2
  33:24 34:5
Uh-huh  34:21
ultimately
  33:17
unable  30:21
understand
  18:17 23:15
  24:10,20,22
  33:15
understood
  22:25
unfairly  22:2
unique  20:10
United  19:9
unjustified
  20:23
unseal  26:20

_____

V

victim  27:23
victims  22:5
video  22:20,
  22 23:22
  25:19
view  30:4
violent  27:24
vote  30:19,23
  31:5

_____

W

walking  21:8
wanted  22:21,
  24,25 23:2,16
  30:13

wanting  26:3
ways  21:14
weekend  29:6
witnesses
  22:1
wondering
  27:6
work  22:23
worked  20:1
working  28:18
  32:23
world  21:13
worse  21:12
wrong  29:17
Wyoming
  19:13,25
  28:18 33:20

_____

Y

_____

years  32:25